**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                         :

UNITED STATES,                      :

         -vs-

Johansi Lopez,                 :
Angel Crispin,
Antonio Batista,            :         19-cr-323 (JSR)
Kevin Brito,
Wandy Dominguez,       :
Amaurys Hernandez,
Jervis Cirino             :

        Defendants

                                           :

- - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - X


### MEMORANDUM OF LAW IN SUPPORT OF
### MOTIONS TO DISMISS THE INDICTMENT AND COMPEL DISCOVERY


Christopher A. Flood
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, N.Y.  10007
Telephone   (212) 417-8734

*Attorney for Defendant Johansi Lopez*


September 13, 2019

Defendants Johansi Lopez, Kevin Brito and Andy Crispin respectfully submit this memorandum of law in support of their motion to compel discovery of certain items and for a limited pretrial inquiry into the United States Drug Enforcement Administration (DEA) reverse sting operations in this District. This discovery and inquiry is necessary for the subsequent filing of a pretrial motion to dismiss on the grounds of, *inter alia*, selective enforcement in contravention of the defendants' Fifth Amendment Equal Protection rights. The requested items are:[1]

- A list of all reverse sting[2] operations involving alleged Hobbs Act robberies of supposedly large narcotics stashes ("Reverse Sting") conducted by the New York office of the U.S. Drug Enforcement Agency ("DEA") during the last 10 years, including the name, race, ancestry, language, and national origin of each individual targeted (whether directly or indirectly) by each such operation ("targets"); the race, ancestry, language, and national origin of the confidential informants, paid informants, or sources ("CI's") involved in each such operation; and the case name and docket number of any prosecution that resulted from each such operation;

- With respect to each of the reverse sting identified in response to Request No. 1, including but not limited to the operation that targeted Mr. Lopez or his co-defendants, any notes, memoranda, or other investigative material showing how targets of the operation were identified and evaluated, including in particular, when, how, and the factual basis for why they were identified and targeted;

- With respect to each of the reverse stings identified in response to Request No. 1, including but not limited to the operation that targeted Mr. Lopez, a statement of the known prior criminal investigations, if any, that any law enforcement agency conducted into each defendant before initiating the reverse sting;

- All DEA manuals, circulars, or other guidance that discuss "stings," "reverse stings," "fake stash operations", "home invasion" investigations,

---

[1] Also attached as Exhibit A to the Affirmation of Christopher A. Flood, Esq., counsel for Mr. Johannsi Lopez (Flood Decl.).

[2] Reverse sting operations refer to those cases in which agents of the government – undercover law enforcement agents or confidential informants or confidential sources working at the direction of law enforcement agents – instigated robberies of fictitious drug stash houses or shipments of drugs that purportedly were being received or transported by supposed narcotics traffickers.

or entrapment operations, including any protocols, controls, policies, guidance, or directions to agents or CI's regarding how to conduct such operations, how to select confidential informants and cooperating witnesses, how to determine which persons to pursue as potential targets, how to ensure that the targets do not seek to quit or leave the conspiracy before an arrest can be made, and how to ensure that investigations are not targeting persons for such operations on the basis of their race, ancestry, or national origin;

- Documents showing how DEA supervisors and managers ensure, and, in this case did ensure, that their agents or CI's do no target persons on the basis of their race, ancestry, or national origin for Reverse Stings, and what actions those supervisors and managers have taken to determine whether agents or CI's were in fact targeting persons for such reasons; and

- The number of CI's that the DEA used in reverse stings each year during the last 10 years and the number of those CI's who provided information regarding, had access to, or suggested targets or potential targets for a reverse sting who are not members of racial or ethnic minority groups.

## PRELIMINARY STATEMENT

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman* v. *United States*, 356 U.S. 369, 372 (1958). Yet, that is exactly what the United States Drug Enforcement Agency (DEA) accomplished here. The reverse sting the DEA directed at Mr. Lopez and his co-defendants failed to infiltrate an existing robbery crew or uncover a criminal conspiracy already in progress. Instead, the DEA succeeded in misleading, cajoling, and persuading Mr. Lopez and his six codefendants—all of whom are Spanish-speaking indigent men of color—to commit inchoate crimes pursuing an illusory chance to lift their families out of poverty.

Before the DEA targeted him for a reverse sting, Mr. Lopez spent most of his time working. He is a lawful immigrant whose primary language is Spanish. In January 2019, he and his wife had just learned they were expecting a daughter, and he worried for his family's security. Hardly prone to violence, Mr. Lopez never committed a robbery and had never been convicted of a crime; he is

not a member of a "crew" and he fostered no plans to rob drug dealers. But the DEA targeted him nonetheless, and he now faces lengthy mandatory consecutive prison sentences and deportation.

There have been many challenges to reverse stings in the Southern District of New York (SDNY), with good reason. The technique subjects people who have not engaged in criminal activity to an extended campaign of inducements and persuasion that blur the incentives and disincentives to commit crime. Moreover, the objective of reverse stings is not to deter or prevent crime, but to ensure that the target commits the offense. It is difficult to reconcile such methods with traditional notions of justice and fair play. The DEA, however, has made extensive use of reverse stings, and it orchestrated the one targeting Mr. Lopez and his codefendants. Since August 2009, there have been 46 DEA reverse sting operations in the SDNY, targeting 179 individual defendants. *See* Exhibit I, Declaration of Professor Crystal S. Yang (Yang Decl.). The 46 cases and 179 targets ("the sample") is believed to be an accurate count of DEA reverse sting cases in the SDNY. It is the largest data set of any previous challenge filed in this District, but also the most conservative: because Mr. Lopez was targeted in a DEA reverse sting, the sample includes only those cases resulting from a DEA reverse sting. We contend that the sample is both sufficiently numerous and sufficiently refined to support reliable analysis and interpretation.

The results are appalling. Despite New York's proud racial and ethnic diversity, every last person arrested in a DEA reverse sting in the SDNY since 2009 is a racial minority of color, while the number of White people subjected to the tactic remains the "the inexorable zero." *Intl. Broth. of Teamsters v. United States*, 431 U.S. 324, 342 (1977). This indisputable disparity cannot be the product of random chance. *See* Exhibit I, Yang Decl., at ¶¶ 5-13. The disparity is not hidden, and it is not an accident. Rather, it is a function of the uniquely dangerous manner by which the DEA conducts reverse stings.

The reverse sting method itself invites abuse, and its use by the Bureau of Alcohol Tobacco and Firearms (ATF) has attracted extensive, principled criticism from the federal bench. *See*, *e.g.*, *U.S. v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012), *reh'g en banc granted, opinion vacated* (Jan. 16, 2013), *on reh'g en banc sub nom. U.S. v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) (Posner, J. dissenting) (describing stash house stings as an ineffectual and "a disreputable tactic"); *and see United States v. Diaz*, 2010 WL 11470885 at *7 (D. Ariz. 2010) (commenting acidly on an ATF reverse sting with "[i]f the Government wants to focus its investigative efforts on seeing if it can entice low income males with little criminal history into participating in lucrative criminal activity, instead of actually trying to resolve prior rip-offs, that is an executive decision."). Criticism notwithstanding, most challenges fail. But the notion that the government induces people to commit serious crimes has provoked scathing broadsides. *See*, *e.g.*, *United States v. Black*, 750 F.3d 1053, 1054 (9th Cir. 2014) (Rheinhart, J. dissenting) (describing ATF stash house stings as "tyrannical" and "a profoundly disturbing use of government power that directly imperils some of our most fundamental constitutional values," implicate "the limits on how our government may treat its citizens," and "pose the question whether the government may target poor, minority neighborhoods and seek to tempt their residents to commit crimes that might well result in their escape from poverty").

However disturbing ATF reverse stings are, the DEA's SDNY reverse stings may show the technique in its most pernicious form. Of particular concern, the DEA employs no discernable protocols, selection criteria, or controls to guide who it targets. Worse, in nearly every case, the DEA all-but delegates the selection and cultivation of reverse sting targets to paid informants and confidential sources seeking leniency.[3] Worse still, the DEA's CS program generally has come

---

[3] The DEA classifies its informants in several different ways, including cooperating witnesses, or CW's; confidential sources, or CS's, and confidential informants, or CI's. *See*, Ex G to Flood

under remarkably frank criticism by the United States Department of Justice Office of the Inspector General for, *inter alia*, lax oversight of CS's, financial mismanagement, and insular institutional culture. *See* Exhibit G, \*\*i-iii. Many cases in the sample present these institution-level structural problems in microcosm, as Mr. Lopez's case does. For example, Mr. Lopez and the CS's were first in contact in January 2019. *See* Exhibit D, ¶ 8(a), and stayed in contact until Mr. Lopez's arrest on April 18, 2019. Flood Decl. ¶ 2. Yet, no recorded calls or DEA debriefing paperwork appears until April. *Id.* The months of ongoing contact between the CS and Mr. Lopez from January to April appears to have been unmonitored and substantially uncorroborated. At minimum, this creates an opportunity for the CS to exaggerate in later reports of conversations. In addition to other varieties of self-dealing that characterize the DEA's CS program in general, the delegation of target selection to untrained and self-interested CS's invites racial disparity. Considered in conjunction with the absence of White defendants in the ten-year sample, the discriminatory effect is manifest.

Likewise, the DEA's discriminatory intent is obvious. The compiled records of several dozen DEA reverse stings in the SDNY reveal no objective criteria for selecting targets and strikingly little oversight of CS's. This is by choice. The ATF promulgates internal standards requiring trained undercover agents, *inter alia*, to assess potential targets before arrest through several in-person meetings, and purports to employ standardized criteria for selecting targets. *See*, *e.g.*, *United States v. Davis*, N.D. Ill, Eastern Division 1:13-cr-63, ECF doc 434 10/11/16 (describing ATF target selection criteria that were disclosed under seal).

---

Decl., Audit of the Drug Enforcement Administration's Confidential Source Policies and Oversight of Higher-Risk Confidential Sources, September 2016, Office of the Inspector General, U.S. Department of Justice, (OIG Report), at p. 4. (also available online at https://oig.justice.gov/reports/2016/a1633.pdf.) We do not presently have information to suggest that the distinctions between these classifications are material, and refer collectively to all civilian informants whose services the DEA employs as "CS's."

In contrast to the ATF's efforts, the DEA relies extensively, and perhaps exclusively, on CS's to identify and cultivate reverse sting targets like Mr. Lopez. DEA agents do not appear to make an independent assessment of the appropriateness of targets their CS's identify. Nor would they have the opportunity, as DEA agents orchestrating SDNY reverse stings do not appear to work undercover. Flood Decl., ¶ 2.  The DEA's CS's are considered the agency's "bread and butter." Ex. B, OIG Report at 46. Yet, when it counts most, the DEA exercises minimal if any oversight of these sources. Abuse, the opportunity for abuse, and self-dealing are rampant. *Id.*

The ten-year sample we obtained includes all 46 known reverse sting operations in the SDNY and encompasses 179 individual people. *See* Flood Decl. ¶ 11; Exhibit I, Yang Decl. at n.1. The striking absence of White targets in the sample sharply contrasts with any relevant comparison population, including the SDNY; Bronx and New York Counties; NYPD arrest statistics; or individuals targeted by ATF reverse sting operations in the Northern District of Illinois, a district with a similar demographic composition. Random chance does not explain the disparity. Rather, the absence of White targets in the ten-year sample is best explained by the influence of race in the DEA's selection of targets to subject to reverse stings.

Mr. Lopez and his codefendants were targeted for a DEA reverse sting because of their race. The evidence presented herein justifies further discovery. Accordingly we respectfully request that the Court conduct a limited pretrial inquiry into DEA reverse sting operations by ordering an evidentiary hearing and the production of the materials set forth in Exhibit A.

## STATEMENT OF FACTS

As is true of virtually every fake stash house case, the Indictment against Mr. Lopez and his co-defendants alleges (1) Conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C.

§ 1951; (2) Conspiracy to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); and (3) Unlawful use, carrying, and possession of a firearm, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Ex. C, Indictment.

The charges are the result of a DEA reverse sting operation that began in early 2019, when Mr. Lopez was introduced to at least two DEA CS's. At that time, CS-1 had been on the DEA payroll since 2014. *See* Ex. D, Criminal Complaint at 4, ¶ 8(a) and n.1. CS-2 had just been arrested and set up Mr. Lopez "in order to obtain leniency at sentencing." *Id.* at n.1.

Over the following months, the CS's kept in regular contact with Mr. Lopez and gained his trust. *See* Flood Decl., ¶ 2. Claiming to have inside information that could lead to a colossal payoff, the CS's solicited Mr. Lopez's participation in a robbery they were planning. The CS's explained to Mr. Lopez that they knew when, where, and how approximately $800,000[4]-worth of lightly-guarded narcotics could easily be stolen from the traffickers who were moving it. *Id.* As they explained, CS-2 would be one of only two people in the delivery car, and there would be no other cars trailing or surveilling the shipment. *Id.* The CS's still needed Mr. Lopez's help, however, as the other driver would be armed with a handgun. *Id.* Since it purportedly was to be an inside job, Mr. Lopez had to make it look to the armed driver like a real robbery. *Id.* To ensure success, the CS's needed Mr. Lopez to assemble a "robbery crew" to display—and be ready to use— overwhelming force. *Id.*

He did not know it, but Mr. Lopez was already caught in a trap. Through the rest of the winter months, CS's repeatedly contacted Mr. Lopez, and always returned to the subject of the robbery. *Id.* They spoke on the phone and texted, and the CS's came by the bar where Mr. Lopez

---

[4] We arrive at this and successive value estimates by take a conservative estimate of the street value of $30,000 for a kilogram of cocaine, and $70,000 for a kilogram of heroin, and multiplying by the number of respective kilograms in the putative delivery.

worked late hours. *Id.* The CS's kept pushing Mr. Lopez to organize a crew. But the day of the putative delivery came and went without Mr. Lopez having assembled one. *Id.* The people who he thought might be interested weren't interested. *Id.* They thought it was a setup. *Id.*

The CS's castigated Mr. Lopez for his failure to seize on the opportunity the missed shipment had represented. *Id.* In truth, Mr. Lopez had been avoiding the CS's. *Id.* Mr. Lopez wanted to move to a larger apartment to accommodate the baby he and his wife were expecting. *Id.* He took a few days away from his job. While he was out, the CS's went to Mr. Lopez's workplace. When they didn't find him, one of the CS's had reached out Mr. Lopez's family. *Id.*

By the middle of April 2019, the CS's claimed the next-scheduled delivery would be more valuable, and would now be worth approximately $1.5 million. *Id.* It was only then that Mr. Lopez allegedly managed to get his codefendants involved. *Id.*

The DEA took an active interest beginning in April 2019. *Id.* Though the CS's had been cultivating Mr. Lopez since January, the first recorded call the CS's made to him was on April 3, 2019, and records of DEA debriefings with the CS's begin on April 10th.[5] *Id.* Thus, between January and April 2019, the CS's contact with Mr. Lopez appears to have been unmonitored.

On April 18, 2019, the day the putative robbery was to take place, Mr. Lopez, Mr. Brito, Mr. Crispen, and their codefendants were all together when the DEA swept in and arrested everyone. Only that afternoon, two of them had purportedly managed to obtain handguns. *Id.*

---

[5] According to the Complaint, on February 12, 2019, Mr. Lopez met with CS-1 and told CS-1 that "he was a member of a group…who targeted drug dealers for robbery[.]" Exhibit C, Complaint ¶ 8(b). CS-1 recorded that conversation. *Id.* No recordings of this meeting have been produced, and the earliest DEA debriefing reports and recordings that have been produced begin in March.

## ARGUMENT

**I.      The DEA Violated the Due Process Rights of Mr. Lopez and his Codefendants by Selectively Targeting Them as People of Color for Reverse Stings.**

The DEA's record of only subjecting non-White people to reverse stings violates the Fifth Amendment's Equal Protection Clause.  Because this is a selective enforcement claim, the standard in *United States* v. *Armstrong*, 517 U.S. 456, 468 (1996) for selective prosecution should not apply. Even if it does apply, Mr. Lopez and his codefendants (together with the demographic information and statistical analysis attached hereto) exceed the threshold of "some evidence tending to show the existence of the essential elements of the defense" of selective enforcement. *United States* v. *Armstrong*, 517 U.S. 456, 468 (1996). Because their claim is legitimate, the Court should compel the Government to produce the materials set forth in Exhibit A and conduct a further limited pretrial inquiry into the DEA's reverse sting program at an evidentiary hearing.

As various courts around the country have noted, the DEA's reverse stings do not stop crime, they create it. The lure of quick cash and systematic pressure ensnare the needy, the guileless, and the desperate. Federal courts are recognizing that "the potential for abuse and mischief that is endemic to fictitious stash-house stings should not be ignored." *United States* v. *Washington*, 869 F.3d 193, 223 (3d Cir. 2017) (McKee, J., concurring). As a matter of policy, reverse stings are "at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law." *United States* v. *Flowers*, 712 F. App'X. 492, 511 (6th Cir. 2017) (Stranch, J., concurring).

Indeed, the systemic price of using reverse stings is enormous. Besides the social, economic, and cultural cost of tearing apart families, reverse stings threaten to undermine the legitimacy of federal criminal law. Misgivings about the governmental use of reverse stings, the unfairness and deception that characterize the method, and the racial disparities it engenders

"generate great disrespect for law enforcement efforts…It is time for these false stash house cases to end and be relegated to the dark corridors of our past." *U.S. v. Brown*, 299 F. Supp. 3d 976, 983–84 (N.D. Ill. 2018).

Without proper protocols, reverse stings lead to great racial disparities.  This is because rather than seeking out perpetrators of crime, reverse stings subject targets to an extended campaign to convince them to engage in crime.  If the recruiters that are part of this process are only Black or Hispanic, the demographics of those arrested in reverse stings would not reflect who is actually committing robberies, possessing firearms, or selling drugs.  Instead, such recruitments would reveal who the DEA subjects to an extended ethical test.

A central mischief emblematic of DEA reverse stings is the agency's evident policy of delegating significant traditional law enforcement functions like investigation to self-interested civilian CS's. This policy prevents the DEA from exercising even minimal oversight of a sting at a time when oversight is perhaps most critically important to prevent the technique from being abused.

As employed by the DEA in the SDNY, reverse stings target economically disadvantaged Latino or Black person, the "direct" target. Over the course of days, weeks, or months, CS's entice the target with the promise of very large amounts of money to stage an inside-job robbery. The CS urges the direct target to recruit other "indirect targets." Because members of any racial group tend to associate with people within the same group, indirect targets predictably share characteristics with direct targets. Where direct targets are Black, indirect targets are also Black; where direct targets are Latino, so are the indirect targets. As the target group comes together, the CS's encourage them to acquire guns and proclaim their willingness to use them in the heist.

Unquestionably, the DEA has the authority to enforce federal criminal law. Doubtless, law

enforcement involves choices among competing priorities. Mr. Lopez and his co-defendants neither challenge the DEA's discretion to make such choices, nor contest its employment of stings, per se. But the DEA's racially selective use of reverse stings have long since been operating in a zone beyond constitutional limits. The Fifth Amendment "prohibits selective enforcement of the law based on considerations such as race." *Whren* v. *United States*, 517 U.S. 806, 813 (1996). But, in a decade of DEA reverse stings, no White people have been subjected to one in the SDNY.

Upon information and belief, in this District, the DEA has overwhelmingly and disproportionately used Latino and Black CS's to stage reverse stings. Working within their own social groups, Latino and Black CS's ensnare Latino and Black direct targets, who the CS's convince to recruit Latino and Black indirect targets.

Clearly, race matters. But if that were not already obvious, in *United States v. Terry*, *et al.*, 13 Cr. 87 (CM), an SDNY reverse sting case, a DEA-employed CS made it perfectly clear:

> No, no, no, it's not gonna happen right now 'cause I wanted to talk to you first, you know what I'm saying?  You told me the first time, Yo, I get down like this.  Then I thought about you.  I was like, Yo, this guy is black, he's perfect!

Ex. E, at *2.

The case agent was listening in, *id.* at *1, and thus was on notice of the CS's misconduct. But if he later admonished the CS not to explicitly target a person for his skin color, it had little effect. A week later, the CS continued with the same line of reasoning. *See* Ex. F.

As the above shows, DEA's lack of protocol on racial disparity leads to the recruitment of only non-White CS's, which in turn subjects only Latino and Black people to reverse stings, thus violating the Fifth Amendment's Equal Protection Clause.

A.   *A limited pretrial inquiry is warranted to evaluate selective enforcement claims where there is "any reason to believe that race played a role in the investigation."*

A selective *enforcement* claim is a "grievance…directed solely at [police or agent] misconduct." *Davis* v. *Malitzki*, 451 F. App'x 228, 234 n.11 (3d Cir. 2011); *see also United States* v. *Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) ("[Defendant] complains not of selective prosecution, but of racial profiling, a selective law enforcement tactic…[Defendant] contended that the DEA agents had enforced the law selectively by choosing to approach, interview, and search African Americans but not Caucasians, *i.e.*, by engaging in racial profiling.").

To make out a substantive claim of either selective enforcement, a defendant must "prove[] that (1) the [defendant], compared with others similarly situated, was selectively treated," *i.e.*, treated differently from other similarly situated individuals; and "(2) that such selective treatment was based on impermissible considerations such as race." *Brown* v. *City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012).

Neither the Supreme Court nor the Second Circuit has, however, articulated a framework for evaluating the sufficiency of a motion for discovery on a selective enforcement claim. In racial profiling cases, several Circuits have applied the *Armstrong* standard for a claim of selective prosecution. *United States* v. *Dixon*, 486 F. Supp. 2d 40, 44-45 (D.D.C. 2007) (citing cases); *see also United States* v. *Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[Armstrong's] elements are essentially the same for a selective-enforcement claim.").

More recently, however, three Circuit Courts of Appeals and several district courts have sensibly recognized that, in the context of a claim of selective enforcement, the *Armstrong* framework is unworkable. *See, e.g.*, *Washington*, 869 F.3d at 213 (3d Cir. 2017) ("[D]istrict judges have more flexibility, outside of the *Armstrong/Bass* framework, to permit and manage discovery

on claims" of selective enforcement); *United States* v. *Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc) (same); *see also United States* v. *Hare*, 820 F.3d 93, 101 (4th Cir. 2016) (quoting *Davis* with approval and noting that appellant's arguments are "well taken" but concluding that discovery already produced by  the ATF was sufficient); *United States* v. *Mumphrey*, 193 F. Supp. 3d 1040, 1048 (N.D. Cal. 2016) (agreeing with reasoning of *Davis*).

These courts have recognized that "the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention" that agents engaged in racial discrimination when selecting confidential informants or targets for sting operations. That is because, unlike prosecutors, law enforcement agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *Davis*, 793 F.3d at 720-21; *cf. Armstrong*, 517 U.S. at 464-65 (referring extensively in formulating framework to, *inter alia*, the "special province of the Executive," the "broad discretion" of "federal prosecutors," "judicial deference to the decisions of …executive officers," "a concern not to unnecessarily impair the performance of a core executive constitutional function," and the "presumption of regularity" tied to prosecutorial decisions).

In addition, "[b]efore holding hearings (or civil trials) district judges regularly, and properly, allow discovery into non-privileged aspects of what agents have said or done." *Id.* Thus, "the special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *Armstrong* and *Bass*…does not inevitably flow to the actions of law enforcement." *Washington*, 869 F.3d at 219.

*Second*, absent discovery, a defendant has no way of knowing which informants were available to law enforcement and who else *could have been* but *was not* targeted to participate in a reverse sting. Even the most zealous of advocates pursuing a selective enforcement claim cannot review arrest records or reports from reverse-sting operations that never occurred. As the Northern

District of Illinois explained in *United States* v. *Paxton*, 2014 WL 1648746 (N.D. Ill. Apr. 17, 2014), because fake stash house operations are "wholly dependent on the involvement" of federal law enforcement  (i) "there is  no defined pool of individuals who are charged and subsequently prosecuted differently to whom defendants may compare themselves"; (ii) it is "impossible that defendants would be able to conduct some sort of test operation . . . to determine the practices of the [investigating agency]"; and (iii) "to produce an analogous situation, the defense would have to encourage Caucasian individuals to identify and approach undercover [federal] agents or confidential informants, or somehow gain knowledge of Caucasian individuals who the [government] was already attempting to target."  *Id.* at *5.

Absent a loosening of the *Armstrong* standard, presenting evidence that similarly situated individuals of other races were treated differently would therefore be unreasonably burdensome, if not impossible, virtually eviscerating the defense of selective enforcement. *See Paxton*, 2014 WL 1648746 at *4 ("In selective enforcement cases…identifying the class of individuals [treated differently]…may prove insurmountable."); *see also United States* v. *Mesa-Roche*, 288 F. Supp. 2d 1172, 1186 (D. Kan. 2003) ("In the context of a challenged traffic stop…imposing the similarly situated requirement makes the selective enforcement claim impossible to prove. It would require the defendant to make a credible showing that a similarly situated individual was *not stopped* by the law enforcement. How could a defendant, *without discovery*, ever make such a showing?") (emphasis in original).

In light of these considerations, the Third Circuit has held that

[i]f claims of selective law enforcement are raised…the standard guiding the district court's discretion is different. While *Armstrong*/*Bass* remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect. The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions…even

> if the underlying challenge is to law enforcement decisions. Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

*Washington*, 869 F.3d at 220-21.

The Seventh Circuit reached a similar conclusion. It held that, if the district court determines on an initial showing by the defendant that there is "any reason to believe that race played a role in the investigation," the court should "proceed in measured steps" and "decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred." *Davis*, 793 F.3d at 722-23; *see also Washington*, 869 F.3d at 221 (endorsing "limited inquiries of the sort recommended in *Davis*," including potentially "the testimony, in person or otherwise, of case agents or supervisors, and the *in camera* analysis of policy statements, manuals, or other agency documents," which can, at the district court's discretion, be disclosed to the defendant).

> B.    *That standard is satisfied here because arrests from reverse sting operations in this District are entirely disproportionate with any relevant comparison population.*

There have been 46 DEA reverse sting operations in the Southern District of New York since 2009. *See* Exhibit I, Yang Decl. These operations targeted 179 individuals[6], 46 directly and 131 indirectly. All 179 reverse sting targets are of color: 177 are Latino or Black, and 2 are Asian.

---

[6] After compiling the ten-year sample, and providing the aggregate counts to Professor Yang, counsel identified an inadvertent undercount of one defendant. *United States v. Sandy Saldana*, 10 Cr. 758 (CM), who is Latino. This would bring the number of targets up to 178. The undercount is conservative. Given the complete absence of White defendants, the effect of incorporating Mr. Saldana in the calculations is expected to be negligible. The error had not effect on the aggregate case count.

*Id.* These numbers stand in marked contrast to the racial diversity of the Southern District of New York, where the targets all were prosecuted.

According to the 2016 census estimates, of the residents of New York and Bronx Counties, 29.5% are White (non- Latino), 20.5% are Black (non-Latino), and 39.7% are Latino.[7]  The remaining counties in the Southern District are less racially diverse, and contain a significantly higher percentage of White residents than New York and Bronx Counties.[8] Indeed, the racial composition of all counties in the Southern District is 43.1% White (non-Latino), 16.7% Black (non-Latino), and 31.4% Latino.[9]

Likewise, the racial composition of the stash house targets departs from NYPD crime and enforcement data for felony drug arrests (42.7% Black, 40.8% Hispanic, and 12.7% White), firearms arrests (65.1% Black, 24.3% Hispanic, 9.7% White), and robbery arrests (60.6% Black, 31.1% Hispanic, 5.1% White).[10] There is no reason to think that the pool of individuals available to the DEA for reverse sting operations—ostensibly individuals the Government believes are already engaged in related conduct—would be differently composed. Indeed, *Armstrong* expressly

---

[7] *See* U.S. Census Bureau, 2016 American Community Survey 5-Year Estimates, "Hispanic or Latino Origin by Race," Table B03002, *available at* https://factfinder.census.gov/ (viewing Table B03002 for New York County, New York and Bronx County, New York).

[8] *See id.* (indicating 54.9% - 80.8% of residents identify as White (non-Latino) in Dutchess County, Orange County, Putnam County, Rockland County, Sullivan County, and Westchester County) (viewing Table B03002 for Dutchess County, New York; Orange County, New York; Putnam County, New York; Rockland County, New  York; Sullivan County, New York; and Westchester County, New York).

[9] *See id.* (viewing Table B03002 and aggregating data for New York County, New York; Bronx County, New York; Putnam County, New York; Sullivan County, New York; Dutchess County, New York; Rockland County, New York; Orange County, New York; and Westchester County, New York).

[10] *See* New York City Police Department, *Crime and Enforcement Activity in New York City (Jan J - Dec 3J, 20J7)*, *available at* https //www1.nyc.gov/assets/nypd/downloads/ pdf/analysis_and_planning/year-end-2017- enforcement-report.pdf.

suggests that (even on the heightened selective prosecution standard) such state-level data could constitute a credible showing of different treatment of similarly situated persons. "In the present case, if the claim of selective prosecution were well founded…respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court." 517 U.S. at 470.

Moreover, a comparison between the reverse sting targets and individuals targeted by the for similar reverse sting operations in other districts further demonstrates the DEA's discriminatory conduct in this District. For example, three courts in the Eastern Division of the Northern District of Illinois permitted defendants to conduct discovery on their selective enforcement claim based on a showing that, during the relevant period, 87.7-90.7% of individuals identified as targets of fake stash-house cases were Black or Latino and 9.2-12.3% were White (non-Latino). Mot. for Disc., *United States* v. *Davis*, No. 13-cr-63 at 7-8 (N. D. Ill. Sept. 9, 2013) ECF No. 109; Mot. for Disc., *United States* v. *Paxton*, No. 13-cr-103 at 5-6 (N.D. Ill. Jun. 25, 2013) ECF No. 77 ("[F]rom 2006 to the present, the ATF and the U.S. Atty's Office have brought at least 17 phony stash house cases 12 of them targeting all African Americans, totaling 42 African Americans; 3 cases targeting 7 white defendants and 3 cases…targeting 8 Latino defendants."); *see also* Mot. for Disc. at 6, *United States* v. *Brown*, No. 13-cr-632 at 6-7 (N.D. Ill. June 10, 2013) ECF No. 123 (citing same statistics as *Paxton*). The racial composition of Chicago-by far the largest city in the Northern District of Illinois-is very similar to that of New York and Bronx Counties (32.3% of Chicago residents identify as White, while 59.7% identify as either Black or Latino).[11]

---

[11] While the racial composition of the Northern District of Illinois as a whole appears to contain a slightly higher percentage of White residents than the Southern District of New York, *see* U.S. Census Bureau, 2016 American Community Survey 5-Year Estimates, "Hispanic or

Unlike in the Northern District of Illinois, however, no white person has been targeted in a DEA reverse sting in this District.

Put in perspective, the demographic makeup of the arrested targets is not merely unlikely, but patently discriminatory in effect and entirely implausible absent a discriminatory animus on the part of the DEA.

|  | Southern District | NY & Bronx Counties | NYPD Robbery Arrests | NYPD Felony Drug Arrests | NYPD Firearm Arrests | Reverse-Sting Ops. in N.D. Ill. | **Stash House Targets** |
|---|---|---|---|---|---|---|---|
| Black or Latino | 48% | 60.2% | 91.7% | 83.5% | 89.4% | 87.7-90.7% | **100%** |
| White | 43.1% | 29.5% | 5.1% | 12.7% | 9.7% | 9.2-12.3% | **0%** |

The principle of "homophily" provides that "contact between similar people occurs at a higher rate than among dissimilar people." *United States* v. *Jackson*, 2018 WL 748372, at *6 (D. N.M. Feb. 7, 2018) (quoting Miller McPherson, *et al.*, *Birds of a Feather: Homophily in Social Networks*, 27 Ann. Rev. Soc. 415, at 416 (2001)).[12]   Given that the effects of homophily are common to

---

Latino Origin by Race," Table B03002, *available at* https //factfinder.census.gov/ (viewing Table B03002 for City of Chicago, Illinois) (in the aggregate, racial composition of counties making up Northern District of Illinois is 54.4% White (non-Latino), 16% Black (non- Latino), and 21.4% Latino, as compared to Southern District which is 43.1% White (non-Latino), 16.7% Black (non-Latino), and 31.4% Latino, *supra* note 8 and accompanying text) (viewing Table B03002 for each county comprising the Northern District of Illinois), this distinction pales in comparison to the fact that, based on the statistics presented in the motions for discovery in *Brown*, *Paxton*, and *Davis*, the proportion of White individuals targeted for fake stash house reverse-sting operations in the Northern District of Illinois (12.3%) is over *seventeen times* greater than in the Southern District of New York (0.7%).

[12] *See also*, James Moody, *Race, School Integration, and Friendship Segregation in America*, 107 Am. J. Soc. 679, 680 (2001); Howard H. Garrison, *Education and Friendship Choice in Urban Zambia*, 57 Soc. Forces 1310, 1320 (1979); Luigi Castelli *et al.*, *Implicit Ingroup Metafavortism: Subtle Preference for Ingroup Members Displaying Ingroup Bias*, 34 Personality & Soc. Psychol. Bull. 807, 807 (2008); J. Miller McPherson & Lynn Smith-Lovin, *Homophily in Voluntary Organizations: Status Distance and the Composition of Face-to-Face Groups*, 52 Am. Soc. Rev. 370, 370 (1987); Raymond Fisman *et al.*, *Racial Preferences in Dating*, 75 Rev. Econ. Stud. 117, 131 (2008); Maureen T. Hallinan & Warren N. Kubitschek, *The Formation of Intransitive*

experience and evident to the DEA from the dozens of these operations it has conducted. The choice to continue using Black and Latino CS's despite the plain discriminatory effect, and the foreseeability of just such a discriminatory impact[13], is significant evidence of discriminatory intent.

Although the Government is sure to argue that the defendants' inability, bereft of discovery, to conclusively prove a negative—*i.e.*, that White individuals are *not* being targeted by the DEA— should defeat this motion, such a showing is unrealistic and not required. Defendants have to present "some evidence", not "conclusive proof", or even necessarily "some *direct* evidence." Since 2009, the DEA has exclusively targeted Black and Latino people with reverse stings, using Black and Latino CS's. The DEA has long since been on notice of the problem, if only through the challenges brought by other defendants ensnared in DEA reverse stings. Meanwhile, each new reverse sting arrest affirms and reifies the obvious racial problem with DEA reverse stings that generate arrests that are entirely out of line with the racial makeup of the relevant population.

Yet, the DEA chooses to persist. At bare minimum, this is circumstantial evidence of discriminatory intent. By any standard, it is "some evidence" of selective enforcements, and it is enough. *See, e.g.,* Order at 1, *Brown*, No. 12-cr-632 (N.D. Ill. July 31, 2013) ECF No. 154 (statistical comparison between racial composition of stash house defendants and demographic makeup of district constituted "strong showing of potential bias in the history of the prosecution of so called 'phony drug stash house rip off cases'" warranting discovery); Order at 2, *Davis*, No. 13-cr-63

---

*Friendships*, 69.2 Soc. Forces 505, 507 (1990).

[13] Notwithstanding the use of Latino or Black CS's, courts in the Ninth Circuit have acknowledged that such a disproportionate effect on minorities is sufficient to show discriminatory intent. *Mumphrey*, 193 F. Supp. 3d at 1063 ("[T]he fact that 100% of all…defendants are African American is probative of discriminatory intent, particularly when the relevant population is not 100% African American.").

(N.D. Ill. Oct. 30, 2013) ECF No. 417 (ordering discovery).

Mr. Lopez, Mr. Brito, and Mr. Crispin respectfully request the Court to compel discovery and conduct a limited inquiry into the DEA reverse stings. They have gone without adequate judicial scrutiny for far too long. In light of this showing, the Court should order an evidentiary hearing and compel the Government to produce the discovery set forth in Exhibit A. *See Lamar*, 2015 WL 4720282, at *3 n.2 (discussing evidentiary hearing); *see also United States* v. *Colon*, No. 3 14-cr-85, Evid. Hr'g, (D. Conn. Sept. 9, 2014) ECF No. 79.

## II.     The Government May Not Rely on Conspiracy to Commit Hobbs Act Robbery as a Basis for the §924(c) Charge Because Hobbs Act Robbery Conspiracy Does Not Constitute a "Crime of Violence" Under Either of Section 924(c)'s Two Definitions.

Count Three of the Indictment charges the defendants with violating 18 U.S.C. § 924(c)(1)(A) by using and carrying a firearm during and in relation to two offenses (i) "a crime of violence,"—the conspiracy to commit Hobbs Act robbery charged in Count One; and (ii) "a drug trafficking crime,"—the narcotics conspiracy charged in Count Two. Because conspiracy to commit Hobbs Act robbery does not constitute a crime of violence the government may not rely on a violation of 18 US.C. § 9151 as a basis for a charge under 18 U.S.C. § 924(c).

In *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019), the United States Supreme Court held that the residual (risk-of-force) clause at 18 U.S.C. § 924(c)(3)(B) is "unconstitutionally vague." Consequently, a predicate "crime of violence" sufficient to support a conviction under 18 U.S.C. § 924(c) is limited to the other subsection of § 924(c)(3) – subsection (c)(3)(A): a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3)(A).

To determine if an offense is a "crime of violence" under this definition, courts "apply the so-called categorical approach. Under this approach, the reviewing court must evaluate whether

the minimum criminal conduct necessary for conviction under a particular statute *necessarily* involves violence. In doing so, the court must focus only on the elements of the offense and may not consider the particular facts of the underlying crime." *United States v. Hendricks*, 921 F.3d 320, 327 (2d Cir. 2019) (citations and internal quotation marks omitted).

"The reviewing court cannot go behind the offense as it was charged to reach [its] own determination as to whether the underlying facts qualify the offense as, in this case, a crime of violence." *Hill II*, 890 F.3d at 55-56 (internal citations omitted). Nonetheless, "in employing the categorical approach . . . to show a predicate conviction is not a crime of violence… there must be a realistic probability, not a theoretical possibility, that the statute at issue could be applied to conduct that does not constitute a crime of violence." *Id.* at 56. To demonstrate such a realistic probability, a defendant "must at least point to his own case or other cases in which the . . . courts in fact did apply the statute in the… manner for which he argues." *Id.*

Conspiracy to commit Hobbs Act robbery plainly does not have as an element the "use, attempted use, or threatened use" of "physical force against the person or property of another," and therefore cannot qualify as a "crime of violence" pursuant to 924(c)(3)(A).

An element of a crime is a "constituent part[] of a crime's legal definition" that the "prosecution must prove to sustain a conviction" and the "jury must find beyond a reasonable doubt to convict the defendant." *Mathis* v. *United States*, 136 S. Ct. 2243, 2248 (2016). Conspiracy does not require either the prosecution to prove or the jury to find that a defendant used, attempted, or threatened physical force. In order to convict a defendant of conspiracy to commit Hobbs Act robbery, the Government must prove only "the existence of a conspiracy to rob" and "knowing participation in that conspiracy." *United States* v. *Santos*, 449 F.3d 93, 97 (2d Cir. 2006). Crucially, "[i]n order to establish a Hobbs Act conspiracy, the government does not have to prove any overt

act." *United States* v. *Clemente*, 22 F.3d 477, 480 (2d Cir. 1994). In *Sessions v. Dimaya*, --- U.S. -, 138 S.Ct. 1204 (2018), the Supreme Court recognized that, while "conspiracy may be a crime of violence under [the risk-of-force clause] because of the risk of force while the conspiracy is ongoing," the elements of the offense are met "as soon as the participants have made an agreement." 138 S. Ct. at 1219. Thus, a conspiracy cannot qualify as a crime of violence under the force clause.

Moreover, it is indisputable that there is a realistic probability that an individual could be prosecuted for conspiring to commit Hobbs Act robbery without "us[ing], attempt[ing to] use, or threaten[ing to] use…physical force." § 924(c)(3)(A). Indeed, on the Government's own theory one need look no further than the present case and similar prosecutions arising from reverse sting-operations to conclude that such a "realistic probability" exists. *See also Thompson* v. *United States*, 2017 WL 6876181, at *1, 3-4 (S.D.N.Y. Apr. 18, 2017) (proof that the defendant "agreed with others to conduct an armed robbery of people carrying a shipment of cocaine and heroin…and that they planned to rob cocaine and heroin and then sell those drugs" sufficient to support a conviction for Hobbs Act conspiracy even in absence of attempt or threat to use physical force).

The Second Circuit's recent decision in *United States v. Barrett*, 2019 WL 4121728 (2d Cir. Aug. 30, 2019)—*Barrett II*—resolves this question. In the original *Barrett* decision—*Barrett I*—903 F.3d 166, 174-176 (2d Cir. 2018), the Second Circuit rejected Mr. Barrett's claim that Hobbs Act robbery conspiracy was not a crime of violence and therefore could not provide the basis for a conviction under 18 U.S.C. §924(c). In reaching this conclusion, the Court in *Barrett I* adopted alternate holdings. First, the Court concluded that Hobbs Act Robbery conspiracy is categorically a crime of violence. *Barrett I*, 903 F.3d at 174. However, that aspect of the Court's holding relied on *both* §924(c)(3)(A) and §924(c)(3)(B). The Court reasoned that when the elements of a

conspiracy's object offense—there Hobbs Act Robbery—is categorically a crime of violence under §924(c)(3)(A), and the agreement element of a conspiracy categorically established the substantial risk of violence under §924(c)(3)(B). *Barrett I, 903 F.3d at* 175. The Second Circuit's alternate holding in *Barrett I* relied on a case-specific analysis. In other words, the Second Circuit abandoned the categorical approach.

Mr. Barrett applied for *certiorari*. Two days after its decision in *Davis*, the Supreme Court granted the writ, vacated the conviction and remanded to the Second Circuit for further action in light of Davis.

In *Barrett II*, the Second Circuit recognized that neither of the prongs of its holding Barrett I survived *Davis*:

> As to Barrett's Count Two conviction, however, *Davis* compels vacatur. The Supreme Court's unequivocal rejection of a case-specific approach to § 924(c)(3)(B) precludes further reliance on the particular murderous violence of Barrett's robbery conspiracy to identify that offense as a crime of violence predicate under § 924(c)(3)(B).

> Our original *Barrett* decision to affirm was not, however, based only on a now-discredited case-specific application of § 924(c)(3)(B). Our first ground for affirming Barrett's Count Two conviction was a determination that Hobbs Act robbery conspiracy could be categorically identified as a crime of violence by reference only to its elements, thereby avoiding the vagueness concerns of the ordinary-case form of categorical analysis rejected in *Johnson, Dimaya*, and now *Davis. See id.* at 176–77. *Barrett*'s elements-based conclusion, however, depended on *both* § 924(c)(3)(A) and § 924(c)(3)(B). We reasoned that where the elements of a conspiracy's object crime (here, Hobbs Act robbery) establish it as a categorical crime of violence under § 924(c)(3)(A), the agreement element of a conspiracy categorically establishes the "substantial risk" of violence under § 924(c)(3)(B). *See id.*

> The Supreme Court did not discuss, much less expressly reject, this hybrid categorical approach in *Davis*. This is hardly surprising; the matter was not before it. Nevertheless, *Davis* gives us reason to think that we can no longer rely on such a categorical approach to affirm Barrett's conviction on Count Two. As the government observes, "[d]espite the obvious logic" of this court's elements analysis, "it still necessarily depends" in part on § 924(c)(3)(B), which *Davis* leaves "no longer valid in any form."

*Barrett II*, 2019 WL 4121728 at *2-3.

There can be no doubt following *Davis* and *Barrett II*, indeed the government conceded as much in *Barrett II*, that conspiracy to commit Hobbs Act robbery does not qualify as a crime of violence under either the risk-of-force clause or the force clause, it may not serve as a predicate offense for a conviction pursuant to 18 U.S.C. § 924(c)(1)(A). Accordingly, Count Three fails to state an offense and must be dismissed.

Count Three also must be dismissed because it is duplicitous in that it prejudicially and impermissibly "combines two or more distinct crimes in a single count," in contravention of Federal Rule of Criminal Procedure 8(a). *United States* v. *Sturdivant*, 244 F.3d 71, 79 (2d Cir. 2001); *see also In re Gomez*, 830 F.3d 1225, 1227 (11th Cir. 2016) (granting application to file second habeas petition on ground that the § 924(c) count of conviction-predicated on both a drug trafficking offense and a crime of violence-was impermissibly duplicitous).

## CONCLUSION

For these reasons, Defendants Lopez, Brito and Crispin request that the Court (i) conduct a limited pretrial inquiry into the selective enforcement of reverse sting operations by ordering an evidentiary hearing and compelling the Government to produce the discovery set forth in Exhibit A; and (ii) dismiss Count Three of the Indictment for failure to state an offense.

Dated:          New York, New York
                September 18, 2019

Respectfully submitted,

Christopher A. Flood
Federal Defenders of New York
52 Duane Street, 10th Floor

New York, New York 10007
Telephone   (212) 417-8734
*Attorney for Defendant Johansi Lopez*