UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | |
|---|---|
| -against- | 19-cr-323 (JSR) |
| JOHANSI LOPEZ,<br>ANGEL CRISPIN,<br>ANTONIO BATISTA,<br>KEVIN BRITO,<br>WANDY DOMINGUEZ,<br>AMAURYS HERNANDEZ,<br>JERVIS CIRINO, | OPINION AND ORDER |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/15/19

JED S. RAKOFF, U.S.D.J.

By their very nature, so-called "reverse sting" operations, in which the Government creates the illusion of crimes in order to catch would-be criminals, are open to potential abuse, since they are not cabined by the demands of reality, but only by the vagaries of imagination. In this case, the defendants assert that there is enough suggestion that reverse stings executed by the U.S. Drug Enforcement Agency ("DEA") in this District are aimed only at persons of color to warrant discovery on the issue of selective enforcement. While mindful of the need to protect agents and informants in this dangerous area, the Court agrees that some initial discovery is warranted here, and possibly more to follow.

I. Background

   a. Reverse Sting Operations

1

The defendants in this case, Johansi Lopez, Angel Crispin, Antonio Batista, Kevin Brito, Wandy Dominguez, Amaurys Hernandez, and Jervis Cirino, are accused of crimes committed in the course of a reverse sting operation conducted by the DEA. Such reverse stings follow a "common format." United States v. Sellers, 906 F.3d 848, 850-51 (9th Cir. 2018). First, law enforcement agencies select targets based on recommendations from confidential informants. Id. at 850; United States v. Davis, 793 F.3d 712, 714 (7th Cir. 2015) (en banc). An undercover agent or informant then poses as a drug courier and offers the target an opportunity to steal drugs that do not actually exist. Targets in turn help plan and recruit other individuals to participate in a robbery of the fictitious drugs. Just before the targets are about to carry out their plan, they are arrested for conspiracy to commit the robbery and associated crimes.

The reverse sting that generated this case is of this kind. In early 2019, two DEA confidential sources, CS-1 and CS-2, identified Johansi Lopez as one of an alleged group of individuals who specialize in robbing drug traffickers. Criminal Complaint at 4, ¶ 8, ECF No. 1. At the direction of law enforcement, CS-1 met with Lopez to discuss a robbery opportunity. CS-1 told Lopez that he knew of a member of a drug trafficking organization (actually CS-2) who could provide inside information about the organization's drug delivery schedule. Over the next several

2

months, CS-1 and CS-2 met with Lopez to devise a robbery of these fictitious drug shipments. During this time, Lopez recruited his codefendants to assist with the robbery. Ultimately, in April 2019, Lopez and his codefendants traveled to the area of the planned robbery, where they were arrested by DEA agents.

b. The Discovery Motion

Defendants, who are all men of color, allege that the DEA's use of a reverse sting against them was part of a practice by which the DEA limits such operations in the Southern District of New York to persons of color. Specifically, they assert that the DEA, by using reverse stings only against people of color, is engaging in selective enforcement in violation of the Fifth Amendment's Equal Protection Clause. Pls. Mem. of Law in Support of Support of Mots. To Dismiss and Discovery ("Pls. Mem.") at 10, ECF No. 36.

To succeed on a selective enforcement claim, defendants will need to show (1) that they, "compared with others similarly situated, w[ere] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race." Brown v. City of Syracuse, 673 F.3d 141, 151-52 (2d Cir. 2012). Because defendants are "unlikely to meet this demanding standard without information that only the government has," Sellers, 906 F.3d at 850, defendants seek discovery into the DEA's reverse sting practices.

II. Legal Framework

3

Whether the Court should grant discovery in this case largely turns on which discovery standard the Court should apply. Despite defining the substantive requirements of a selective enforcement claim, the Second Circuit has not "articulated a framework for evaluating the sufficiency of a motion for . . . discovery on a selective enforcement claim." United States v. Garcia-Pena, 2018 WL 6985220, *4 (S.D.N.Y. Dec. 19, 2018).

The Government would have the Court import the discovery standard for selective prosecution claims articulated in United States v. Armstrong, 517 U.S. 806 (1996). In Armstrong, the Supreme Court held that a defendant seeking discovery on a <u>selective prosecution</u> claim must provide "some evidence tending to show the existence of . . . (1) discriminatory effect and (2) discriminatory intent." Id. at 468 (quoting United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974)). This is an explicitly "rigorous standard," Armstrong, 517 U.S. at 468, that is "premised on the notion that the standard for discovery for a selective prosecution claim should be nearly as rigorous as proving the claim itself." Sellers, 906 F.3d at 852. The defense here argues that Armstrong's discovery standard should not apply in the selective enforcement context, but is less clear as to what standard should apply.

III. <u>Analysis</u>

   a. <u>The Unsuitability of the Armstrong Standard</u>

4

"[A] stash house sting entails considerable government involvement -- including direct solicitation of the target and total control over the parameters of the robbery, particularly the quantity of cocaine held in the fictitious stash house -- and appears highly susceptible to abuse." United States v. Hare, 820 F.3d 93, 103-04 (4th Cir. 2016). This "potential for abuse and mischief that is endemic to fictitious stash-house stings" (i.e. reverse stings) necessarily includes a greater risk of "racial profiling" and race-based enforcement. United States v. Washington, 869 F.3d 193, 223 (McKee, J. concurring in part and dissenting in part), cert. denied, 138 S. Ct. 713 (2018).

Accordingly, as now recognized by at least three federal circuits, selective enforcement claims should be open to discovery on a lesser showing than the very strict one required by Armstrong. See Sellers, 906 F.3d at 855 (9th Circuit); Washington, 869 F.3d at 219-21 (3rd Circuit); Davis, 793 F.3d at 720-21 (7th Circuit en banc). These circuits have held that there are material differences between selective prosecution and selective enforcement claims that warrant subjecting selective enforcement claims to a lower evidentiary standard.

For one thing, the policy considerations that motivated the Armstrong Court are less important in the selective enforcement context. Armstrong explained that a rigorous discovery standard was warranted for selective prosecution claims because

5

prosecutorial decisions are entitled to a "presumption of regularity," Armstrong, 517 U.S. at 464 (citation omitted), and because courts should defer to prosecutors in their exercise of a core executive power. Id. at 464. These considerations have less bearing here because law enforcement agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." Davis, 793 F.3d at 720. Indeed, courts frequently assess the credibility of law enforcement officers in suppression hearings and at trial and grant criminal defendants discovery into various law enforcement operations. Sellers, 906 F.3d at 853. Given these differences, "the law supports greater flexibility when the discretionary decisions of law enforcement, rather than those of prosecutors, are targeted by a defendant's request for discovery." Washington, 869 F.3d at 197.

Furthermore, employing the Armstrong discovery standard would functionally preclude discovery in any selective enforcement case. The Armstrong discovery standard requires defendants to make a threshold showing that similarly situated individuals have not been similarly prosecuted. While such evidence is ostensibly available in the selective prosecution context based on a comparison of arrest and prosecution data, this is not the case in the selective enforcement context. "Asking a defendant claiming selective enforcement to prove who could have been targeted by an informant, but was not, or who the [law enforcement agency] could

6

have investigated, but did <u>not</u>, is asking him to prove a negative." <u>Sellers</u>, 906 F.3d at 853. Applying <u>Armstrong</u>'s standard to a selective enforcement claim would thus function to make such a claim "impossible to prove." <u>Id.</u> at 854. This is too high a bar.

This Court is thus persuaded that there are important distinctions between selective prosecution and selective enforcement claims that argue for a less demanding standard to be applied before the defendants here can obtain discovery.

b. <u>Applying a Lower Standard</u>

However, while the aforementioned circuit courts have provided convincing reasons to reject the <u>Armstrong</u> approach in the selective enforcement context, they have not provided a clear alternative discovery standard. Nor have they been precise about how much discovery should be permitted. Rather, these courts have left district courts to determine whether and how much discovery is warranted on a case-by-case basis. <u>See, e.g.</u>, <u>Washington</u>, 869 F.3d at 220 ("[W]e decline to mandate a precise system or order that a district court must follow. As we have often said, matters of docket control and discovery are committed to broad discretion of the district court.").

To this Court, however, the appropriate standard is that where a defendant who is a member of a protected group can show that that group has been singled out for reverse sting operations to a statistically significant extent in comparison with other groups,

7

this is sufficient to warrant further inquiry and discovery. Here, defendants have presented evidence that not a single one of the 179 individuals targeted in DEA reverse sting operations in SDNY in the past ten years was white, and that all but two were African-American or Hispanic. Pls. Mem. at 16-17. This is in stark contrast to the racial makeup of New York and Bronx Counties, which are 20.5% African-American, 39.7% Hispanic, and 29.5% White.[1] This is also in contrast to NYPD crime and enforcement data for felony drug arrests (42.7% African-American, 40.8% Hispanic, and 12.7% White), firearms arrests (65.1% African-American, 24.3% Hispanic, 9.7% White), and robbery arrests (60.6% African-American, 31.1% Hispanic, 5.1% White).[2]

Furthermore, defendants have provided compelling expert analysis demonstrating that these numbers are statistically significant. According to a rigorous analysis conducted by Dr. Crystal S. Yang, a Harvard law and economics professor, it is highly unlikely, to the point of statistical significance, that the racially disparate impact of the DEA's reverse sting operations

---

[1] See U.S. Census Bureau, 2016 American Community Survey 5-Year Estimates: Hispanic or Latino Origin by Race, Table B03002, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_17_1YR_B03002&prodType=table.

[2] See New York City Police Dep't, Crime and Enforcement Activity in New York: City (Jan 1 – Dec 31, 2017), https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2017-enforcement-report.pdf.

8

is simply random. Christopher Flood Aff., Exh. I, ECF No. 38. (Dr. Yang's analysis is attached to the Opinion as Appendix A.) The combination of raw data and statistical analysis is sufficient to meet the aforesaid standard and thus warrant discovery.

c. Scope of the Discovery

In granting discovery in this case, the Court emphasizes that it must proceed in incremental steps. Courts adopting a discovery standard lower than Armstrong for selective prosecution claims have confirmed the importance of granting discovery only in "measured steps." See Davis, 793 F.3d at 722 (faulting the district court for granting a "blunderbuss order" allowing too much discovery too soon). The Court finds that an incremental approach is a prudent means of preventing fishing expeditions into what is, after all, a sensitive area involving law enforcement operations that places the very lives of agents and informants in danger.

Accordingly, and for now, discovery will be limited to the Government providing to the defendants, by no later than November 22, 2019, (1) all DEA manuals, circulars, protocols, and the like that provide guidelines for how and when reverse stings should be originated; and (2) all notes, memoranda, or other investigative material showing how defendants were identified and evaluated as targets in this particular reverse sting operation. The second category can include such appropriate redactions as, in the Government's opinion, are necessary to protect the safety of any

9

agent or informant, but unredacted copies must be provided, on an ex parte basis, to the Court. The Court will then hold another hearing on Tuesday, November 26, 2019 at 4:00 pm to assess what next steps, if any, are appropriate.

SO ORDERED.

Dated: New York, NY
November /3, 2019

JED S. RAKOFF, U.S.D.J.

APPENDIX A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| United States of America, | : | **DECLARATION OF PROFESSOR CRYSTAL S. YANG** |
|---|---|---|
| -v- | : | |
| Johansi Lopez, | : | |
| Angel Crispin, | | |
| Antonio Batista, | : | 19-cr-323 (JSR) |
| Kevin Brito, | | |
| Wandy Dominguez, | : | |
| Amaurys Hernandez, | | |
| Jervis Cirino | : | |
| Defendants. | : | |

-----------------------------------------------------------x

Pursuant to 28 U.S.C. §1746, I, CRYSTAL S. YANG, J.D., Ph.D., declare under penalty of perjury that the following is true and correct:

1. I am a Professor of Law at Harvard Law School and Faculty Research Fellow at the National Bureau of Economic Research. My primary research areas are in criminal law and criminal procedure, with a focus on testing for and quantifying racial disparities in the criminal justice system. Before joining the Harvard Law School faculty, I was an Olin Fellow and Instructor in Law at The University of Chicago Law School. I am admitted to the New York State Bar and previously worked as a Special Assistant United States Attorney in the U.S. Attorney's Office for the District of Massachusetts.

2. I received a B.A. in economics *summa cum laude* from Harvard University in 2008, an A.M. in statistics from Harvard University in 2008, a J.D. *magna cum laude* from Harvard Law School in 2013, and a Ph.D. in economics from Harvard University in 2013. My undergraduate and graduate training involved substantial coursework in quantitative methods.

3. I have published in peer-reviewed journals such as the *American Economic Review*, *The Quarterly Journal of Economics*, the *American Economic Journal: Economic Policy*, and have work represented in many other peer-reviewed journals and outlets.

4. I make this Declaration in support of a motion being submitted by the defendants to compel the government to provide discovery in this case.

**Statistical Analyses Pertinent to Motion**

5. I was retained by the Federal Defenders of New York to provide various statistical analyses relevant to the defendants' motion in this case. Specifically, I was asked to evaluate whether the observed racial composition of targets in reverse-sting operations in the Southern District of New York could be due to random chance.

6. To undertake this statistical analysis, I first had to obtain the racial composition of targeted individuals in DEA reverse-sting stash house cases brought in the Southern District of New York for the ten-year period beginning on August 5, 2009 and ending on August 5, 2019. Based on the materials in *Lamar* and *Garcia-Pena*, as well as additional searches conducted by the Federal Defenders of New York, I understand that there have been 46 fake stash house reverse-sting operations conducted by the DEA during this time period. These 46 operations targeted 179 individuals of whom zero are White, two are Asian, and 177 are Latino or Black – the "sample."[1] Given these counts, this means that of the targeted individuals, 98.9% are Latino or Black (and 100% are non-White). Thus, the relevant question at hand is whether the observed racial composition of the sample could be due to random chance alone if the DEA sampled from a population of similarly situated individuals.

7. Second, I had to define what the underlying population of similarly situated individuals is. In other words, what is the possible pool of all similarly situated individuals who could have been targeted by the DEA in a reverse-sting operation? Because the DEA's criteria for being a target in these reverse-sting cases is unknown, my statistical analysis will assume a variety of hypothetical benchmark populations. If the government provides its selection criteria for being a target in these reverse-sting cases, a more definitive statistical analysis may be possible. Based on materials from *Garcia-Pena* and *Lamar*, I have identified eight hypothetical benchmark populations. Below, I present the hypothesized populations and the racial composition (% Latino or Black) in each population in order of least conservative (i.e. smallest share of Latino or Black) to most conservative (i.e. highest share of Latino or Black):

   a. 2016 American Community Survey 5-year estimates on counties in the SDNY (from *Garcia-Pena*): **48.1%** Latino or Black
   b. 2016 American Community Survey 5-year estimates on Bronx and New York Counties (from *Garcia-Pena*): **60.2%** Latino or Black
   c. New York Police Department (NYPD) data from January 1 – December 31, 2017, on felony drug arrests in New York City (from *Garcia-Pena*): **83.5%** Latino or Black
   d. Estimates by Prof. Kohler-Hausmann on men aged 16-49 living in New York City who have prior New York State (NYS) violent felony convictions (from *Lamar*): **87.1%** Latino or Black

---

[1] In consultation with the Federal Defenders of New York, this sample is obtained by taking the 33 cases and 144 defendants identified in *Garcia-Pena* or *Lamar*, excluding two cases and five defendants that are either not DEA cases or reverse-sting cases, and including an additional 15 cases and 40 defendants that were *not covered* by the time frames included in the *Lamar* or *Garcia-Pena* analysis.

e. Estimates by Prof. Kohler-Hausmann on men aged 16-49 living in New York City who have prior NYS felony convictions (from *Lamar*): **87.5%** Latino or Black
f. NYPD data from January 1 – December 31, 2017 on firearms seizures arrests in New York City (from *Garcia-Pena*): **89.4%** Latino or Black
g. Reverse-sting operation defendants in the Northern District of Illinois (from *Garcia-Pena*): **87.7-90.7%** Latino or Black[2]
h. NYPD data from January 1 – December 31, 2017 on robbery arrests in New York City (from *Garcia-Pena*): **91.7%** Latino or Black

8. For each of these eight hypothesized populations, I then conduct an exact hypothesis test for binomial random variables. This is the standard statistical test used for calculating the exact probability of observing $x$ "successes" out of $n$ "draws" when the underlying probability of success is $p$ and the underlying probability of failure is $1-p$. Here, each defendant represents an independent draw and a success occurs when the defendant is Latino or Black. Using the exact hypothesis test, I test whether the observed proportion of Latinos or Blacks observed in the sample ($x = 177$, $n = 179$) is equal to the hypothesized population probability/proportion $p$. Under this test, the null hypothesis is that the observed proportion is not statistically different from the hypothesized population proportion. The alternative hypothesis is that the observed proportion is statistically different from the hypothesized population proportion, a two-sided test.[3] Each exact hypothesis test produces a corresponding $p$-value, which is the probability of observing a proportion as extreme or more extreme than the observed proportion assuming that the null hypothesis is true. A small $p$-value implies that the observed proportion is highly unlikely under the null hypothesis, favoring the rejection of the null hypothesis.

9. The following Table 1 presents each of the eight hypothesized population proportions, the null hypothesis under each population, the alternative hypothesis under each population, and the corresponding $p$-value using the observed proportion of Latinos or Blacks in the sample assuming 179 independent draws:

Table 1 ($x = 177$, $n = 179$)

| Hypothesized Population Proportion | H₀ Null Hypothesis | Hₐ Alternative Hypothesis | $p$-value |
|---|---|---|---|
| a. **48.1%** Latino or Black | H₀: $p = 0.481$ | Hₐ: $p \mathrel{!}= 0.481$ | 0.0000 |
| b. **60.2%** Latino or Black | H₀: $p = 0.602$ | Hₐ: $p \mathrel{!}= 0.602$ | 0.0000 |
| c. **83.5%** Latino or Black | H₀: $p = 0.835$ | Hₐ: $p \mathrel{!}= 0.835$ | 0.0000 |
| d. **87.1%** Latino or Black | H₀: $p = 0.871$ | Hₐ: $p \mathrel{!}= 0.871$ | 0.0000 |
| e. **87.5%** Latino or Black | H₀: $p = 0.875$ | Hₐ: $p \mathrel{!}= 0.875$ | 0.0000 |
| f. **89.4%** Latino or Black | H₀: $p = 0.894$ | Hₐ: $p \mathrel{!}= 0.894$ | 0.0000 |
| g. **90.7%** Latino or Black | H₀: $p = 0.907$ | Hₐ: $p \mathrel{!}= 0.907$ | 0.0000 |

---

[2] I choose 90.7% (the upper end of the range) as the relevant proportion given that it yields the most conservative estimates.

[3] This two-sided test takes the most conservative approach (in contrast to a one-sided test) because it allows for the possibility of both an over-representation *and* under-representation of Latinos or Blacks relative to the hypothesized population proportion.

| h. 91.7% Latino or Black | $H_0: p = 0.917$ | $H_a: p \mathrel{!}= 0.917$ | 0.0001 |

10. The above statistical calculations in Table 1 show that regardless of which of the eight hypothesized population proportions is chosen, one could reject the null hypothesis at conventional levels of statistical significance. For example, one could reject the null hypothesis at the standard 5% significance level which requires that the $p$-value be less than 0.05. All eight $p$-values are substantially smaller than 0.05 and would lead to a rejection of the null hypothesis even using more conservative 1%, 0.5%, or 0.1% significance levels. In other words, it is extremely unlikely that random sampling from any of the hypothetical populations could yield a sample of 179 targeted individuals where 177 or more individuals are Latino or Black.

11. Alternatively, one may be interested in the reverse question of what the underlying population proportion would have to be such that the observed proportion could be due to random chance alone assuming there are 179 independent draws. Using the standard 5% significance level, I have calculated that the hypothesized population would have to be composed of at least 96.0% Latinos or Blacks in order for one to <u>not</u> be able to reject the null hypothesis. In other words, unless the pool of similarly situated individuals is comprised of at least 96.0% Latinos or Blacks, it is highly unlikely that one could get a sample of 179 targeted individuals where 177 or more individuals are Latino or Black.

12. One potential question with the statistical analyses in Table 1 is whether the assumption that each of the 179 targeted individuals is an independent draw is reasonable. For example, what if the race/ethnicity of individuals in each reverse-sting operation is correlated, such that if one individual targeted in an operation is Latino or Black, the other individuals are also more likely to be Latino or Black? This correlation within operations could result if there is homophily, or "the principle that a contact between similar people occurs at a higher rate than among dissimilar people." Miller McPherson et al., *Birds of a Feather: Homophily in Social Networks*, 27 Ann. Rev. Soc. 315, at 416 (2001). It is impossible to know the true degree of homophily or correlation among individuals targeted in reverse-sting operations, particularly when the DEA's selection criteria is unknown. But suppose that we took the most conservative approach and assumed that there is perfect homophily (i.e. a perfect correlation of 1) such that if one individual targeted in the operation is Latino or Black, all other individuals in that same operation are also Latino or Black. Under this conservative assumption, we can then treat the observed sample as if there were only 46 independent draws (rather than 179 draws).[4] To observe a racial composition of 98.9% Latino or Black would thus require that at least 45 out of 46 draws resulted in a Latino or Black individual being targeted.[5]

13. For each of the eight hypothesized benchmark populations, I then test whether the observed proportion of Latinos or Blacks observed in this alternative sample ($x = 45$, $n = 46$) is equal to the hypothesized proportion from an underlying population assuming that

---

[4] I make the simplifying assumption that each of the 46 operations targeted the average number of codefendants, $3.89 = 179/46$.
[5] Technically, 45.494 draws would need to be of Latino or Black individuals but I conservatively round down to the nearest integer.

there are only 46 independent draws. The following Table 2 presents each of the eight hypothesized population proportions, the null hypothesis under each population, the alternative hypothesis under each population, and the corresponding *p*-value using the observed proportion of Latinos or Blacks in the sample assuming 46 independent draws:

Table 2 ($x = 45$, $n = 46$)

| Hypothesized Population Proportion | $H_0$ Null Hypothesis | $H_a$ Alternative Hypothesis | *p*-value |
|---|---|---|---|
| a. **48.1%** Latino or Black | $H_0$: $p = 0.481$ | $H_a$: $p \mathrel{!}= 0.481$ | 0.0000 |
| b. **60.2%** Latino or Black | $H_0$: $p = 0.602$ | $H_a$: $p \mathrel{!}= 0.602$ | 0.0000 |
| c. **83.5%** Latino or Black | $H_0$: $p = 0.835$ | $H_a$: $p \mathrel{!}= 0.835$ | 0.0045 |
| d. **87.1%** Latino or Black | $H_0$: $p = 0.871$ | $H_a$: $p \mathrel{!}= 0.871$ | 0.0255 |
| e. **87.5%** Latino or Black | $H_0$: $p = 0.875$ | $H_a$: $p \mathrel{!}= 0.875$ | 0.0257 |
| f. **89.4%** Latino or Black | $H_0$: $p = 0.894$ | $H_a$: $p \mathrel{!}= 0.894$ | 0.0871 |
| g. **90.7%** Latino or Black | $H_0$: $p = 0.907$ | $H_a$: $p \mathrel{!}= 0.907$ | 0.1240 |
| h. **91.7%** Latino or Black | $H_0$: $p = 0.917$ | $H_a$: $p \mathrel{!}= 0.917$ | 0.1795 |

14. Under this conservative assumption of perfect homophily, the above statistical calculations in Table 2 show that under the first five hypothesized population proportions (a-e), one could reject the null hypothesis at the standard 5% significance level. In other words, even if the hypothesized population proportion of Latinos or Blacks is as high as 87.5%, it is highly unlikely that random sampling could yield a sample of 46 individuals where 45 or more individuals are Latino or Black. One, however, cannot reject the null hypothesis for the next three hypothesized population proportions (f-h). Again, because I have no knowledge of the DEA's selection criteria of potential targets, it is impossible to know which of the hypothesized populations captures the relevant pool of similarly situated individuals. A more definitive statistical analysis may be possible if the government provides the requested selection criteria.

15. As before, I also ask the reverse question of what the underlying population proportion would have to be such that the observed proportion could be due to random chance alone assuming that there are only 46 independent draws. Using the standard 5% significance level, I have calculated that the hypothesized population would have to be composed of at least 88.5% Latinos or Blacks in order for one to <u>not</u> be able to reject the null hypothesis. In other words, unless the pool of similarly situated individuals is comprised of at least 88.5% Latinos or Blacks, it is highly unlikely that one could get a sample of 46 targeted individuals where 45 or more individuals are Latino or Black.

Dated: Cambridge, Massachusetts
September 13, 2019

/s/ Crystal S. Yang
Crystal S. Yang